FILED
2012 May-23 PM 02:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

DEVINA H. DRAGG, )
)
Plaintiff, )
)
v. ) CIVIL ACTION NO. 11-G-3442-M
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security, )
)
Defendant. )

**MEMORANDUM OPINION**

The plaintiff, Devina H. Dragg, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for Social Security Benefits. Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied.  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983).  To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." Bloodsworth, at 1239 (citations omitted).  Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth, at 1239.

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled.  The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i).  For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable

by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20 C.F.R. § 404.1520 (a)-(f). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;

(2) whether she has a severe impairment;

(3) whether her impairment meets or equals one listed by the Secretary;

(4) whether the claimant can perform her past work; and

(5) whether the claimant is capable of performing any work in the national economy.

Pope v. Shalala, 998 F.2d 473, 477 (7th Cir. 1993); accord McDaniel v. Bowen, 800 F.2d 1026, 1030 (11th Cir. 1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." Pope, at 477; accord Foot v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995).

In the instant case, the ALJ, Michael L. Brownfield, determined the plaintiff met the first two tests, but concluded did not suffer from a listed impairment. The ALJ found the plaintiff unable to perform her past relevant work. Once it is determined that the plaintiff cannot return to his prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do." Foote, at 1559. When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical-Vocational Guidelines (the grids). Foote, at 1558-59. The presence of a non-exertional impairment (such as pain, fatigue or mental illness) also prevents exclusive reliance on the grids. Foote, at 1559. In such cases "the [Commissioner] must seek expert vocational testimony. Foote, at 1559.

**DISCUSSION**

Listing 12.05B provides that a claimant is disabled if she has a "valid verbal, performance, or full scale IQ of 59 or less" and satisfies the diagnostic description in the introductory paragraph of Listing 12.05B. Listing 12.00A ("If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing."). The introductory paragraph to Listing 12.05C is as follows:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

The language of 12.05 closely tracks the DSM-IV-TR definition of mental retardation. The phrase "significantly subaverage general intellectual functioning" is also used in the DSM definition of Mental Retardation. The DSM states that "general intellectual functioning" is defined by the intelligence quotient (IQ or IQ equivalent)." DSM-IV-TR at 41. The DSM also defines "significantly subaverage intellectual functioning." "Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below . . . ." DSM-IV-TR at 41  Therefore, a valid IQ score of 70 or below satisfies the first requirement of the diagnostic description.

The second requirement of the diagnostic description of Listing 12.05 is the presence of "deficits in adaptive functioning." This also is a requirement of the DSM: "Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." DSM-IV-TR at 42. The DSM offers guidance in determining whether the diagnostic description of Listing 12.05 has been met. The DSM

defines mild mental retardation as an I.Q in the range of 50-55 to approximately 70. The DSM description of Mild mental retardation contains the following:

> By their late teens, they can acquire academic skills up to approximately the sixth-grade level. During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

DSM-IV-TR at 43. Therefore, a diagnosis of Mild Mental Retardation should normally be found to satisfy the diagnostic criteria of Listing 12.05.

In this circuit, it is presumed that a persons IQ remains fairly constant throughout her life and a valid IQ test meeting the Listing criteria creates a rebuttable presumption that the condition manifested itself before age twenty-two. Hodges v. Barnhart, 276 F.3d 1265, 1268-69 (11th Cir. 2001). Therefore, unless there is evidence showing the plaintiff's intellectual deficits were not present before age 22, it is presumed that they were.

In the present case, the plaintiff was administered the WAIS-IV on November 29, 2010, by Jack L. Bentley, Jr., Ph. D., during a consultative mental examination at the behest of the Social Security Administration. The plaintiff's full scale IQ score was 56. R. 342. Doctor Bentley diagnosed the plaintiff with

Mild Mental Retardation, and noted that the plaintiff "was reasonably motivated and cooperative" during testing. R. 343. Doctor Bentley noted that the plaintiff's IQ scores placed her in the "Middle of the Mild Range of Mental Retardation." Id. He found the plaintiff to be "functioning at a second to third grade level." R. 343-44. He also was of the opinion that the plaintiff "would likely need assistance in managing funds that may be awarded." R. 344.

In spite of the IQ score of 56 and the diagnosis of Mild Mental Retardation reported by Dr. Bentley, the only examiner to administer IQ testing, the ALJ found the plaintiff did not meet Listing 1.05B. One reason given by the ALJ was that the plaintiff has "a twenty-year work history, during which time she raised three children, and that she is mentally capable of performing her regular activities of daily living." R. 17. However, Dr. Bentley was aware of the plaintiff's work history when he diagnosed her as being mentally retarded and assessed her IQ score. His report recounts her work history as follows:

> Ms. Dragg has worked most of her adult life. She was employed at various fast food restaurants including Popeye's, McDonald's, and Church's Chicken. The claimant also worked at Tyson's Chicken plant for four years. She was last employed at Popeye's seven months ago until her physician advised her to discontinue this job due to her having to stand for prolonged periods of time.

R. 341. In spite of this work history, Dr. Bentley diagnosed Mild Mental Retardation. It was unreasonable, and improper for the ALJ to refuse to accept Dr. Bentley's diagnosis and reported IQ scores based upon the plaintiff's work history because Dr. Bentley was aware of the plaintiff's work history. Doctor Bentley, and not the ALJ, is the expert in assessing the plaintiff's intellectual functioning. Had he found the plaintiff's work history inconsistent with his diagnosis, he would have stated so in his report.

The only other reason given by the ALJ for refusing to credit Dr. Bentley's findings was that "there is no indication within [his] assessment that Dr. Bentley ever tested the claimant for verisimility, or that he even considered exaggeration as one possible explanation for the drastically low scores." R. 17. Doctor Bentley was administering IQ testing at the behest of the ALJ in order to determine the plaintiff's intellectual functioning.[1] As the ALJ recognized, Dr Bentley is "deemed by the regulation[s] to be a 'highly qualified expert in Social Security disability evaluation.'" R. 17. The ALJ's assumption that such an expert would not consider exaggeration or malingering as a matter of course is unwarranted. In fact, Dr. Bentley found the plaintiff's motivation and cooperation

[1] The previous consultative mental examiner, David R. Wilson, Ph.D., estimated the plaintiff's intellectual functioning to be in the Borderline range, but noted that "formal testing would be necessary to make a definitive determination." R. 247.

with testing to be reasonable.  There is no suggestion in his report that he did not deem the plaintiff's test scores to be valid.  It was thus improper for the ALJ to refuse to credit the IQ scores and diagnosis of Mild Mental Retardation by his own expert.

The diagnosis and IQ scores reported by Dr. Bentley are not contradicted by other medical sources and establish that the plaintiff meets Listing 12.05B.  This is a case where "the [Commissioner] has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt."  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).  In such a case the action should be reversed and remanded with instructions that the plaintiff be awarded the benefits claimed.  Id.  An appropriate order will be entered contemporaneously herewith.

DONE 23 May 2012.

UNITED STATES DISTRICT JUDGE
J. FOY GUIN, JR.